**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

FASHA REID,

                            Plaintiff,                    3:21-cv-089
                                                         (AMN/ML)
v.

THE NEW YORK STATE OFFICE OF
CHILDREN AND FAMILY SERVICES,

                            Defendant.

**APPEARANCES:**                          **OF COUNSEL:**

**DANNY GRACE, PLLC**                      **DANIEL GRACE, ESQ.**
225 Broadway – Suite 1200                  **DOUGLAS MACE, ESQ**.
New York, New York 10007
Attorneys for Plaintiff


**ATTORNEY GENERAL FOR THE**
**STATE OF NEW YORK**                      **KEITH J. STARLIN, ESQ.**
The Capitol                                **KONSTANDINOS D. LERIS, ESQ.**
Albany, NY 12224-0341                      Assistant Attorneys General
Attorneys for Defendant

**Hon. Anne M. Nardacci, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

       On January 25, 2021, Fasha Reid ("Plaintiff") commenced this action against the New

York State Office of Children and Family Services ("Defendant" or "OCFS") and Finger Lakes

Residential Center ("Finger Lakes").[1]   Dkt. No. 1 (the "Complaint").   Plaintiff alleges

discrimination and retaliation claims against Defendant under Title VII of the Civil Rights Act of

---

[1] Finger Lakes was voluntarily dismissed from this action by Plaintiff on November 23, 2022.  *See*
Dkt. No. 40.

1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title VII").  *Id.* at ¶ 1.[2]  On March 26, 2021,

Defendant filed an Answer to the Complaint.  Dkt. No. 8.

Presently before this Court are Defendant's motion for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure, Dkt. No. 42 (the "Motion"), Plaintiff's Opposition,

Dkt. Nos. 46-49, and Defendant's Reply thereto, Dkt. No. 50.

For the reasons stated herein, Defendant's Motion is granted.

## II.    BACKGROUND

Plaintiff is an African American woman who was employed by OCFS as a Youth Division

Aid Two ("YDA2") at Finger Lakes from August 29, 2019 to May 16, 2020.[3]  *See* Dkt. No. 1 at

¶¶ 14, 21, 29.  OCFS is an executive agency of the State of New York ("State"), which sets and

enforces policies concerning the well-being and safety of children, families, and communities.

Dkt. No. 42-8 at ¶ 2; Dkt. No. 46 at ¶ 2.  OCFS' Division of Juvenile Justice and Opportunities for

Youth ("DJJOY") is responsible for the supervision and treatment of court-placed youth.  Dkt. No.

42-8 at ¶ 3; Dkt. No. 46 at ¶ 3.   DJJOY is responsible for the operation, supervision, and

management of 11 residential facilities, including Finger Lakes.  Dkt. No. 42-8 at ¶ 4; Dkt. No. 46

at ¶ 4.   Finger Lakes is a facility located in Lansing, New York, which houses adjudicated male

juvenile delinquents, predominantly between the ages of 13 and 18.  Dkt. No. 42-8 at ¶ 5; Dkt. No.

46 at ¶ 5.

On May 16, 2020, Plaintiff was terminated from her position at Finger Lakes.  Dkt. No.

42-8 at ¶ 95; Dkt. No. 46 at ¶ 95.  Defendant alleges that Plaintiff was terminated from her position

---

[2] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

[3] Plaintiff alleges that her employment was subject to a probationary period.  Dkt. No. 42-2 at 27:20-22.  Defendant contends that temporary employees, like Plaintiff, are "never on probation and may be terminated at will."  Dkt. No. 42-8 at ¶ 23.

due to Plaintiff's unsatisfactory job performance.  Dkt. No. 42-8 at ¶¶ 76-84.   Plaintiff contends that Defendant discriminated and retaliated against her based on gender and race when Defendant terminated her employment.  *See* Dkt. No. 1 at ¶¶ 83-108; Dkt. No. 46 at ¶ 96.

On June 18, 2020, Plaintiff filed a verified charge with the Equal Employment Opportunity Commission ("EEOC") charging Defendant with unlawful discrimination and retaliation arising from the same facts alleged in the Complaint.  Dkt. No. 1 at ¶ 9.  On or around October 27, 2020, Plaintiff received a Right to Sue letter from the EEOC.  *Id.* at ¶ 10.  Plaintiff commenced this action on January 25, 2021, which was within 90 days of her receiving the Right to Sue letter.  *Id.* at ¶ 11.

### A.    Plaintiff's Job Performance

Defendant alleges that Plaintiff's job performance was unsatisfactory because Plaintiff (i) improperly completed her time sheets, Dkt. No. 42-7 at 25-26; (ii) improperly and untimely submitted mileage sheets for use of a State vehicle, *id.* at 36-37; (iii) failed to advise Defendant that her driver's license was suspended while still using State vehicles, *id.* at 73; (iv) was excessively late and absent from work, *id.* at 32, 35, 39-43; (v) improperly used a work phone for personal phone calls (*i.e.*, 57 such phone calls in the month of November 2019, *id.* at 32); and (vi) failed to perform requisite job duties, including the logging of keys and the screening of visitors, *id.* at 29, 32-33.  *See* Dkt. No. 42-9 at 18.

It is undisputed that Plaintiff met with her supervisor, Nicole Bowen ("Bowen"), numerous times during her approximately nine-month employment period to discuss Plaintiff's unsatisfactory job performance.  *See* Dkt. No. 42-8 at ¶ 54; Dkt. No. 46 at ¶ 54.

On November 13, 2019, Plaintiff met with Bowen and received formal counseling

concerning her job performance.[4]  Dkt. No. 42-7 at 29.  Plaintiff was counseled by Bowen because she failed to properly log keys on three separate occasions in October 2019.  *Id.*; Dkt. No. 42-8 at ¶ 55.  During this meeting, Plaintiff was advised—and acknowledged—that the proper logging and knowledge of the "whereabouts of facility keys is one of the most basic components of facility safety and security" and a requirement of Plaintiff's job duties.  Dkt. No. 42-7 at 29.  Bowen authored a memorandum dated October 29, 2019, documenting the matters discussed during the counseling session.  *Id*

On January 5, 2020, Plaintiff and Bowen met to discuss Plaintiff's time and attendance issues and unsatisfactory performance of job duties.  Dkt. No. 42-8 at ¶¶ 56, 57; Dkt. No. 46 at ¶¶ 56, 57.  To memorialize this meeting, Bowen authored—and Plaintiff signed—an Employee Supervision and Support Session Record documenting the matters discussed during the meeting.  Dkt. No. 42-7 at  32-33.

On January 21, 2020, Plaintiff and Bowen met again to discuss multiple employment issues, including Plaintiff's eight unscheduled sick leave absences and Plaintiff's purported refusal to properly submit mileage sheets for the use of a State van.  Dkt. No. 42-8 at ¶¶ 65, 66, 68; Dkt. No. 46 at ¶¶ 65, 66, 68.  To memorialize this meeting, Bowen authored—and Plaintiff signed—a memorandum describing the matters discussed during the meeting.  Dkt. No. 42-7 at 25-27.

On May 5, 2020, Plaintiff was counseled by the Finger Lakes facility director, Jeffrey Calkins, for failing to report that her driver's license was suspended.  *Id.* at 73; Dkt. No. 42-8 at ¶ 75; Dkt. No. 46 at ¶ 75.  On that same day, Plaintiff received an unsatisfactory employee evaluation

---

[4] Plaintiff does not dispute that she met with Bowen on November 13, 2019, but she contends that the meeting was a "rush through meeting."  Dkt. No. 46 at ¶ 55.

for the six-month period of August 2019 to March 2020.[5]   Dkt. No. 42-7 at 75-82.   Bowen completed—and Plaintiff signed—a Probation/Employee Appraisal Report documenting her evaluation of Plaintiff's performance.   *Id.*   In the performance evaluation, Bowen noted that Plaintiff (i) "missed an extended period of time during the evaluation period making a proper assessment of her quality of work difficult to measure," and had "been a No Call No Show for multiple shifts" and "failed to provide appropriate documentation for these absences;" (ii) "requires multiple prompts to complete and turn in tasks or assignments;" (iii) "has struggled with professionalism in dealing with supervisors and other departments;" and (iv) "has had a contentious relationship with her peers."  *Id.* at 75-76.  Plaintiff received at least one unsatisfactory mark in six out of the seven applicable performance categories.  *Id.* at 77-82.  Plaintiff received five unsatisfactory marks in "Task 2: Plans and Organizes Work," which primarily addresses OCFS' time and attendance expectations of an employee in the YDA2 position.   *Id.* at 82. Moreover, Plaintiff admits "that employee attendance is an important factor in every probationary period and employees with documented, unacceptable attendance during the probationary period may be subject to termination."  Dkt. No. 46 at ¶ 10.

Defendant contends that Plaintiff was absent 33 times during the period of January 21, 2020 to the date of her termination, May 16, 2020.  Dkt. No. 42-8 at ¶ 71.  Plaintiff does not dispute that she was absent during this period but disputes that it was 33 times.[6]  Dkt. No. 46 at ¶ 71.

---

[5] Plaintiff disputes that she received an overall unsatisfactory evaluation, contending that "I don't remember this being an unsatisfactory box at the bottom.  I remember me having a few boxes checked of unsatisfactory but I don't remember that specific thing at the bottom."  Dkt. No. 46 at ¶ 76.

[6] Defendant submitted documentary evidence that appears to be Plaintiff's timesheets from Defendant's time keeping software, Leave & Accrual Tracking System, which show that Plaintiff was absent at least 33 times during the period January 21, 2020 to May 16, 2020.  *See* Dkt. No. 42-7 at 39-71.

Plaintiff asserts that she was late on some days due to her daughter being in the hospital, and having a car that was not reliable in winter weather conditions. Dkt. No. 46 at ¶ 58. Defendant alleges—and Plaintiff does not dispute—that Plaintiff missed eight shifts in March 2020 for a death in her family, and that she did not request the time off, nor did she notify Finger Lakes that she would be absent. Dkt. No. 42-8 at ¶ 73; Dkt. No. 46 at ¶ 73. Additionally, Defendant alleges—and Plaintiff does not dispute—that Plaintiff missed 12 shifts in March and April 2020 during which time she claimed she had COVID-19 but failed to provide any documentation to OCFS supporting her diagnosis. Dkt. No. 42-8 at ¶ 74; Dkt. No. 46 at ¶ 74.

### B.      Plaintiff's Allegations of Discrimination and Retaliation

Plaintiff alleges that throughout her employment, co-workers made comments and took actions that resembled "intentional discrimination, retaliation, [and] harassment" "because of her race, gender, and other protected activities." Dkt. No. 1 at ¶ 23. More specifically, Plaintiff contends that she was discriminated and retaliated against based on gender and race when (i) she was subjected to a hostile working environment;[7] (ii) Defendant failed to provide her with adequate training; (iii) she was assigned to work a purportedly less preferable shift; (iv) Defendant failed to take her complaints of harassment and discrimination "seriously;" and (v) Defendant terminated

---

[7] Plaintiff did not plead a hostile work environment cause of action in her Complaint. *See generally* Dkt. No. 1. In her Opposition, Plaintiff acknowledged that she had not pled such a cause of action and stated that her allegations of a hostile work environment were plead as an element of her "Title VII cause of action." Dkt. No. 47 at 21. Based on Plaintiff's statement in her Opposition, the Court will consider Plaintiff's allegations that she was subjected to a hostile work environment as support for her race-based and gender-based discrimination and retaliation claims, and not as a separate cause of action. Moreover, the Court notes that it would be improper to consider a hostile work environment cause of action at this stage of the litigation, given that Plaintiff never pled such a cause of action. *See Feliz v. City of New York*, No. 19-CV-6305 (DLC), 2023 WL 2601111, at *4 (S.D.N.Y. Mar. 22, 2023) (noting that a plaintiff may not amend a complaint in opposing a dispositive motion); *Kearney v. Cnty. of Rockland*, 373 F. Supp. 2d 434, 440-41 (S.D.N.Y. 2005) (declining to consider hostile work environment claim raised for the first time in opposition to summary judgment) (collecting cases).

her employment.  *See* Dkt. No. 42-9 at 13; *see generally* Dkt. No. 1.

### a.   Statements and Inappropriate Workplace Behavior

Plaintiff asserts that the following statements and actions occurred during her employment, which she perceived to be discriminatory, harassing, and retaliatory based on her gender and race:

### i.   Statements and Actions by Non-Supervisory Employees

"On [August 26, 2019,] Plaintiff and another new [African American] female YDA2, Brianna Mayu ("Mayu"), were called the "new booties" by Sean Williams, who is an African American male employee in the Information Technology department.  Dkt. No. 1 at ¶ 26; Dkt. No. 42-2 at 67:16-25, 68:8-9, 69:16-22.

On September 10, 2019, Plaintiff alleges that Mr. George ("George"), who is white, repeatedly referred to Plaintiff and Mayu as "the twins."  Dkt. No. 1 at ¶ 29; Dkt. No. 42-2 at 85:7-17, 85:24-86:16, 87:15-16.   Plaintiff alleges that she confronted George and that "it became obvious that he was referring to their race."  Dkt. No. 1 at ¶ 29.

On or around September 16, 2019, a white male employee purportedly referred to Plaintiff as a monkey, when he stated, "not my monkey, not my circus,"[8] "as an expression of his anger and frustration in having to train Plaintiff."  *Id.* at  ¶¶ 31, 32.  Plaintiff also alleges that around the time that this comment was made, she overheard Michelle Foster ("Foster") referring to Plaintiff as "the bitch."  *Id.* at ¶ 32; Dkt. No. 42-2 at 103:18-25, 104:2-23.

In early October 2019, Plaintiff contends that Brandi Mainville ("Mainville"), a white female employee, stated "I know y'all like to stick together" in reference to Mayu and Plaintiff.

---

[8] In her Complaint, Plaintiff alleges that a Finger Lakes employee stated, "not my monkey, not my circus," however, in her deposition, Plaintiff testified that the employee stated, "not my monkey, not my ball."  *See* Dkt. No. 42-2 at 96:4-97:12.  In addition, it is not clear based on Plaintiff's testimony, which employee made this comment—either Mr. Drew ("Drew") or George made this comment.  *Compare id.* at 93:25-94:16, *with id.* at 85:7-17.

Dkt. No. 1 at ¶ 38; Dkt. No. 42-2 at 82:17-19.

In or around November 8, 2019, Plaintiff and a Finger Lakes employee had a verbal altercation in which the employee "called Plaintiff a fucking joke." Dkt. No. 1 at ¶ 46. Plaintiff filed an Employee Report of Workplace Violence Incident Report detailing this altercation. *Id.* at ¶ 45.

On December 6, 2019, Plaintiff alleges that she overheard Mainville telling staff to "watch out" for Plaintiff because she was "trying to get people jammed up" and "fired." *Id.* at ¶ 61; Dkt. No. 42-3 at 1:18-2:2. Plaintiff also alleges that Mainville referred to Plaintiff as a "rat."[9] Dkt. No. 1 at ¶ 61. Plaintiff contends that Mainville made these statements following the commencement of Defendant's investigation into Plaintiff's complaints of discrimination and harassment. *See id.* at ¶¶ 60-63.

On January 19, 2020, Plaintiff alleges that Mainville called her a "dumb black bitch," following a disagreement concerning the performance of certain job duties. Dkt. No. 42-3 at 30:12-32:2; Dkt. No. 42-7 at 23.

Plaintiff contends that Mainville, Foster, George, and others made comments about "black girls' hair" and "black people['s] skin being oily." Dkt. No. 42-2 at 88:5-20, 110:5-111:14. Plaintiff also contends that Finger Lakes employees referred to her as a "nobody," "Ho," "slut," and a "fast girl from the Bronx." Dkt. No. 42-2 at 64:7-20; Dkt. No. 47 at 6.

Additionally, Plaintiff alleges that (i) her lunch was thrown out of the refrigerator on multiple occasions; (ii) her jacket was doused in milk; and (iii) she was threatened by George and

---

[9] On December 10, 2019, Plaintiff and Mainville attended a dispute resolution meeting with Bowen and Deborah Bacinelli, Associate Director of Treatment. Dkt. No. 42-8 at ¶¶ 44, 45; Dkt. No. 46 at ¶¶ 44, 45. Following the meeting, Bowen authored a memorandum, noting, among other things, the steps taken by Defendant to address the interpersonal issues between Plaintiff and Mainville. *See* Dkt. No. 42-7 at 20-21.

Drew when they stated that they had guns in their cars and that she should be "careful in the parking lot" and "just careful."  Dkt. No. 42-2 at 112:4-22; Dkt. No. 47 at 6-8.

Finally, Plaintiff alleges that there was systemic racism at Finger Lakes.  Dkt. No. 47 at 8-9.  For example, Plaintiff alleges that Mainville and other employees would make remarks that the mothers of African American juveniles housed at Finger Lakes were "crackheads" and that "black people are usually crackheads and that's why their kids are here."  *Id.*; Dkt. No. 42-2 at 119:7-121:20.  Plaintiff also alleges that Finger Lakes employees had "animosity" towards the African American juveniles housed in the facility, as she would hear the employees making inappropriate racist remarks, such as "this black mother f-er," when referring to African American juveniles.  Dkt. No. 47 at 8.  Plaintiff contends that she did not hear similar remarks being made in reference to white juveniles.  *See* Dkt. No. 42-2 at 120:15-121:4.

### ii.    Statements by Supervisory Employees

In or around October 2019, Plaintiff alleges that her supervisor, Bowen, posted a graphic on her Facebook page that had the phrase "snitches get stitches" depicted, and that Plaintiff's co-workers knew this was about the staff at Finger Lakes.  Dkt. No. 1 at ¶ 40.  Plaintiff asserts that this graphic was taken down in or around December 2019.[10]  Dkt. No. 47 at 9.

Plaintiff alleges that Bowen stated to Plaintiff that "I'm the one that brought you in, I can take you out," in response to Plaintiff expressing her concerns to Bowen that other employees were repeatedly telling Plaintiff that she would be fired because she was "rocking the boat" by lodging complaints against other employees.  *Id.* at 10-11; *see* Dkt. No. 42-4 at 2:3-3:3.

Plaintiff also alleges that an unnamed supervisor referred to her as the "thick new girl."  Dkt. No. 42-2 at 65:3-8; Dkt. No. 47 at 7.

---

[10] Bowen denies posting such a graphic on her Facebook page.  Dkt. No. 42-7 at ¶ 17.

### b.  Training

Plaintiff alleges that she did not receive adequate training on how to perform the job duties of a YDA2.  *See* Dkt. No. 1 at ¶¶ 25, 58, 69.  Defendant disputes Plaintiff's contention and avers that Plaintiff received adequate training.  Dkt. No. 42-8 at ¶¶ 30-32.  Defendant alleges—and Plaintiff does not dispute—that on or around September 26, 2019, Plaintiff completed a FLRC Control Center Task Application Checklist, acknowledging that she had received training in several job behaviors required of the YDA2 position.  Dkt. No. 42-7 at 14-18; Dkt. No. 42-8 at ¶ 32; Dkt. No. 46 at ¶ 32.  Moreover, it is undisputed that in October 2019, Plaintiff attended a multi-week training program at the training academy in Albany, New York.  Dkt. No. 1 at ¶ 39; Dkt. No. 42-8 at ¶ 30; Dkt. No. 46 at ¶ 30.

### c.  Complaints

Plaintiff alleges that Defendant did not take her complaints seriously and "systematically discouraged any reporting of mistreatment in the workplace."[11] Dkt. No. 1 at ¶ 41.  As an example, Plaintiff contends that in response to her lodging a complaint against the employees who purportedly referred to her as a monkey and a bitch, Bowen allegedly stated "it will blow over, you gotta be tough in this job."  *Id.* at ¶¶ 32-34.  In addition, Colin Parker ("Parker"), a male African American employee, told Plaintiff that she "shook the building" and that "nobody ever reports what's going on, what happens at Finger Lakes" when she lodged her complaints of

---

[11] Plaintiff asserts that she reported every discriminatory, harassing, and retaliatory comment and action to either her direct supervisor or another individual in management.  *See generally* Dkt. Nos. 1, 42-2, 42-3, 42-4.  Bowen became Plaintiff's supervisor in or around mid-November 2019.  Dkt. No. 42-8 at ¶ 33; Dkt. No. 46 at ¶ 33.  Bowen avers that while she was Plaintiff's supervisor, she received several complaints from Plaintiff regarding only one employee, Mainville.  Dkt. No. 42-7 at ¶ 16.  Bowen also avers that the only complaint that she received concerning allegations of discrimination was Plaintiff's January 19, 2020 complaint that Mainville called her a "dumb black bitch."  *Id.* at ¶¶ 24, 25.  Bowen asserts that she forwarded Plaintiff's complaint to OER, in accordance with Defendant's policies and procedures.  *Id.* at ¶ 26.

discrimination and harassment. *Id.* at ¶ 59; Dkt. No. 42-2 at 200:16-25; Dkt. No. 42-3 at 1:2-17.

Defendant asserts that OCFS "has a zero-tolerance policy for workplace discrimination." Dkt. No. 42-8 at ¶ 14. All complaints that are lodged by employees of a protected class are investigated by Office of Employee Relations ("OER") Anti-Discrimination Investigations Division ("ADID"). *Id.* at ¶ 16. "If a complaint is submitted to an OCFS employee, that employee is required to send the complaint to OER for investigation." *Id.* at ¶ 18. Defendant contends that all of Plaintiff's complaints were "handled appropriately and pursuant to OCFS policy (*i.e.*, investigated by Joann Marshall ("Marshall") from OER's ADID). *Id.* at ¶ 38.

On November 6, 2019, Plaintiff met with Marshall, who took Plaintiff's complaints and informed her that they would meet again to gather documentation. Dkt. No. 1 at ¶ 44. After this meeting, Marshall interviewed Parker, Mayu, Foster, Drew, and possibly others. Dkt. No. 42-2 at 194:12-195:3; Dkt. No. 47 at 10.[12] Moreover, Plaintiff met with Marshall two additional times, including on December 5, 2019. Dkt. No. 1 at ¶ 55; Dkt. No. 42-2 at 141:23-142:23, 193:23-194:10.

### d. Shift Change

Plaintiff alleges that from September 3, 2019 to September 17, 2019, her shift was 1:15 p.m. to 9:30 p.m., with Fridays and Saturdays as pass days. Dkt. No. 1 at ¶ 24. Beginning September 18, 2019, Plaintiff's shift was changed to 5:15 a.m. to 1:30 p.m., with Sundays and Mondays as pass days. *Id.* On November 9, 2019, Plaintiff's shift was changed to the 2:00 p.m. to 10:00 p.m. shift. *Id.* at ¶ 47. Plaintiff contends that this shift was known as the less preferable

---

[12] The Court notes that the parties did not submit any evidence regarding Defendant's investigation into Plaintiff's complaints with their Summary Judgment briefing. Plaintiff alleges that Defendant's investigation into her complaints was still pending when she was terminated, and she contends it was against Defendant's policy to terminate her while such an investigation was pending. *See* Dkt. No. 47 at 21-22.

shift, and that she was assigned to this new shift in retaliation for lodging her complaints of, among other things, discrimination. *Id.* at ¶ 48.

Defendant asserts that because Plaintiff was a temporary employee, she was not entitled to a specific work schedule. *See* Dkt. No. 42-8 at ¶ 26. Moreover, Defendant asserts that "[t]emporary employees are required to fill vacancies in the weekly work schedule—*e.g.*, spaces that were not bid on, or that are open to an employee being on vacation—and their work schedule is subject to change each week." *Id.* at ¶ 27.

Plaintiff disputes that she was a temporary employee and asserts that she was "hired subject to a probationary period before becoming a permanent employee." Dkt. No. 46 at ¶ 21. Plaintiff contends that she had a set schedule but would pick up additional shifts if she was called to do so. *Id.* at ¶ 27; Dkt. No. 47 at 12.

### e.  Termination

On May 6, 2020, Bowen sent Leanne Bentley ("Bentley"), a human resources specialist, an e-mail with Plaintiff's unsatisfactory performance review attached, requesting permission to terminate Plaintiff's employment. Dkt. No. 42-7 at 84, Dkt. No. 42-8 at ¶ 82; Dkt. No. 46 at ¶ 82. Bentley avers that she was neither aware of Plaintiff personally, nor aware that Plaintiff had submitted any complaints concerning gender or race discrimination. Dkt. No. 42-6 at ¶ 29. Plaintiff's termination was approved shortly thereafter, and Plaintiff was terminated on May 16, 2020. Dkt. No. 42-8 at ¶¶ 89, 95.

### III.   STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

Plaintiff asserts four causes of action pursuant to Title VII: (i) discrimination based on

gender; (ii) discrimination based on race; (iii) retaliation based on gender; and (iv) retaliation based on race.[13]  Dkt. No. 1 at ¶¶ 83-108.  Defendant argues that it is entitled to summary judgment on all four claims.  *See* Dkt. No. 42-9.  The Court agrees.

### A.  Plaintiff's Discrimination Claims

"Title VII provides that it is 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or natural origin.'"  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e–2(a)).  Discrimination claims under Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, Plaintiff must first make a *prima facie* case of discrimination by showing that "(1) [s]he is a member of a protected class, (2) [s]he satisfactorily performed the duties of [her] position, (3) [s]he was subject to an adverse employment action, and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in that class."  *Reyes v. New York State Off. of Child. & Fam. Servs.*, No. 00 CIV. 7693 (SHS), 2003 WL 21709407, at *7 (S.D.N.Y. July 22, 2003), *aff'd*, 109 F. App'x 466 (2d Cir. 2004) (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)) (other citation omitted).  In *Texas Dep't of Cmty. Affairs v. Burdine*, the Supreme Court made clear that a plaintiff's burden of "establishing a prima face case . . . is not onerous."  450 U.S. 248, 253 (1981).  "In fact, the plaintiff's burden of establishing a *prima facie* case has been frequently described as 'minimal.'"  *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335

---

[13] Although Plaintiff references state law claims in her Opposition, the Complaint only sets forth claims pursuant to Title VII.  *See generally* Dkt. No. 1.  Therefore, the Court will only address Plaintiff's Title VII claims.  *See, e.g., Kearney*, 373 F. Supp. 2d at 440-41.

(2d Cir. 1997) (en banc) (quoting *St. Mary's Honor Cntr. v. Hicks*, 509 U.S. 502, 506 (1993), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)).

"Once an employee makes a *prima facie* case of [discrimination], the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (citation omitted).  If the employer provides such a reason, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for race [or sex] discrimination." *Id.*  To rebut the articulated justification for the adverse action, "the burden then shifts back to the plaintiff to show that the [employer's] stated reason for the adverse employment action was in fact pretext" for discrimination. *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011) (alterations, internal quotation marks and citation omitted).  "[T]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks and citation omitted).

### i. *Prima Facie* Case

Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination because she cannot satisfy the second and fourth elements. Dkt. No. 42-9 at 13-17.  It is undisputed that Plaintiff, who is an African American woman, is a member of a protected class. *Id.* at 13.  It is also undisputed that Plaintiff's employment was terminated.  *Id.* Defendant concedes that Plaintiff's termination constitutes an adverse employment action but argues that (i) none of Plaintiff's other asserted adverse employment actions constitute an adverse employment action and (ii) no adverse employment action occurred in circumstances giving rise to an inference of

discrimination.[14]  *Id.* at 14-17; *see Terry*, 336 F.3d at 138 (noting that examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.").

The Court agrees with Defendant that Plaintiff cannot make out a *prima facie* case of discrimination based on gender or race because, even with her minimal burden, she cannot demonstrate that there is a question of material fact as to (i) whether she satisfactorily performed her job duties and (ii) whether her termination occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class.  *See, e.g., McLee v. Chrysler Corp.*, 109 F.3d 130, 134-37 (2d Cir. 1997) (affirming district court's finding that plaintiff did not satisfy the second element to establish a *prima facie* case of discrimination where plaintiff's employment performance was unsatisfactory); *Cao-Bossa v. New York State Dep't of Lab.*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *15-16 (N.D.N.Y. Aug. 19, 2021), *supplemented*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 5321946 (N.D.N.Y. Nov. 16, 2021), *and aff'd*, No. 21-2593-CV, 2023 WL 2376071 (2d Cir. Mar. 7, 2023) (finding that plaintiff could not establish a *prima facie* case of discrimination where she received an unsatisfactory performance evaluation).  Therefore, summary judgment is appropriate on each of Plaintiff's discrimination claims.

### 1.  Satisfactory Performance of Job Duties

Defendant argues that Plaintiff cannot satisfy this element because Plaintiff did not

---

[14] The Court notes that Plaintiff has asserted other actions that could arguably constitute adverse employment actions.  *See* Dkt. No. 42-9 at 14; *see generally* Dkt. No. 1.  For purposes of resolving this Motion, whether the other alleged actions constitute adverse employment actions is irrelevant because it is undisputed that Plaintiff's termination was an adverse employment action.

satisfactorily perform her job duties and ultimately received an unsatisfactory six-month performance evaluation.  Dkt. No. 42-9 at 13-14.  "'[I]n determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors,' because 'job performance cannot be assessed in a vacuum' and 'the ultimate inquiry is whether an employee's performance meets h[er] employer's legitimate expectations.'"  *Cao-Bossa*, 2021 WL 3674745, at *15 (quoting *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)); *see also Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008) (noting that "courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance").  "Whether performance is satisfactory 'depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge.'"  *Id.* (quoting *Thornley v. Penton Publishers*, 104 F.3d 26, 29 (2d Cir. 1997)).  "'Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, . . . they must also allow employees to show that the employer's demands were illegitimate or arbitrary.'"  *Id.* (quoting *Meiri*, 759 F.2d at 995).

Here, the record, including Plaintiff's own admissions and assertions, establishes that Plaintiff's job performance was unsatisfactory.  It is undisputed that Plaintiff received 16 unsatisfactory marks at her six-month performance evaluation.  Dkt. No. 42-7 at 77-82.  It is undisputed that Plaintiff signed the performance evaluation, thereby acknowledging that she received an unsatisfactory performance evaluation.  *Id.* at 82.  It is also undisputed that Plaintiff met with Bowen at least three times over the course of her nine-month employment to discuss her unsatisfactory job performance.  *See* Dkt. No. 42-8 at ¶¶ 55, 56, 65; Dkt. No. 46 at ¶¶ 55, 56, 65.  Moreover, Plaintiff admits that she was advised that "excellent time and attendance is expected" in the YDA2 position.  Dkt. No. 46 at ¶ 28.  Although Plaintiff disputes that she had 33 unapproved

absences during the period of January 21, 2020 to May 16, 2020, she does not state the number of times that she believes she was absent. *See id.* at ¶ 71. Plaintiff, however, admits that she had at least 20 unapproved absences during that same period. *Id.* at ¶¶ 73, 74. Moreover, aside from Plaintiff's assertion as to the number of times she was absent without approval, there is no evidence to contradict the documentary record showing that Plaintiff was absent without approval at least 33 times during this period. *See* Dkt. No. 42-7 at 39-71.

In addition to Plaintiff's time and attendance issues, Plaintiff's performance of her job duties fell below expectations. *See id.* at 77-82. Plaintiff was counseled by Bowen for failing to log keys and appropriately screen individuals entering the facility. *Id.* at 29. Plaintiff was also counseled for (i) failing to submit mileage sheets for the use of a State van; (ii) failing to notify Defendant that her driver's license was suspended; and (iii) using the facility phone for personal calls over 50 times in November 2019. *Id.* at 32-33, 36-37, 73. It is clear from the record what the requirements of Plaintiff's position were and the multiple ways in which Plaintiff's performance fell below those requirements. Moreover, there is nothing in the record demonstrating that the requirements of Plaintiff's position were illegitimate or arbitrary.

Although Plaintiff offers explanations for why her job performance was unsatisfactory (*i.e.,* she was late to work because of an unreliable vehicle in winter conditions), *see, e.g.,* Dkt. No. 46 at ¶ 58, Plaintiff did not respond to Defendant's argument that she cannot satisfy this element. Indeed, in her Opposition, Plaintiff incorrectly contends that Defendant does not challenge Plaintiff's satisfaction of this element. *Compare* Dkt. No. 47 at 16, *with* Dkt. No. 42-9 at 13-14.

Based on the record before the Court, the Court finds that no reasonable factfinder could conclude that Plaintiff performed her job duties satisfactorily.

## 2.   Inferences of Discrimination

Next, Defendant argues that Plaintiff cannot satisfy this element because there is "no evidence" that an adverse action, including the termination of her employment "took place in circumstances giving rise to an inference of discrimination" based on gender or race.  Dkt. No. 42-9 at 16.   Specifically, Defendant argues that Plaintiff has failed to adduce any evidence demonstrating that similarly situated counterparts were treated differently—*e.g.*, that white males were treated differently.  *Id.* at 16-17.  In response, Plaintiff does not directly address Defendant's argument, and although not clear, appears to argue that Plaintiff can satisfy this element because (i) "of her well-documented history of complaints of discriminatory treatment and hostile work environment;" and (ii) "[s]he was told repeatedly that she was rocking the boat, and that she needed to be careful."  Dkt. No. 47 at 17.

Inference of discrimination "is a flexible [standard] that can be satisfied differently in differing factual scenarios."  *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (summary order) (internal quotation marks and citation omitted).   A plaintiff may raise an inference of discrimination by showing that her employer treated her "less favorably than a similarly situated employee outside her protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  To make such a showing, the plaintiff must demonstrate that she was "'similarly situated in all material respects' to the individuals with whom she seeks to compare herself."  *Id.* (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  In other words, "plaintiff must establish that a fellow employee who did not share her race, ethnicity, color, sex and/or gender" with an unsatisfactory performance evaluation was treated differently than Plaintiff.  *See Fletcher v. ABM Bldg. Value*, No. 14 Civ. 4712 (NRB), 2018 WL 1801310, at *10-11 (S.D.N.Y. Mar. 28, 2018), *aff'd*, 775 F. App'x 8 (2d Cir. 2019).

Here, when questioned at her deposition regarding the grounds for her discrimination claims, Plaintiff testified to the following:

Q. Were any white males that were also Y.D.A. Two's treated differently than you?

A. Yeah, they got more respect.

Q. How else were they treated differently?

A. They -- they were able to -- it's a lot.  They -- they basically got to do whatever they wanted to do, whether it was verbally abuse people or, you know, or just, I don't know how to word it exactly, to be honest.  But just the -- just the way they were able to just say what they can say you know, say what they wanted to say and not -- nothing happened or, you know, supervisors laugh it off and things like that. The comments that -- the comments that they made; they weren't taken -- the supervisors didn't take it seriously.  They will go, oh, he was just playing around, things like that.

Q: Were they given better shifts than you?

A.  I can't say. . . . So I can't really say that.

Dkt. No. 42-3 at 90:18-91:18.  By Plaintiff's own admission, the grounds for her gender and race discrimination claims are that she believes that white males "got more respect" and were allowed to "verbally abuse people." *Id.*  But Plaintiff in this action was not terminated because she verbally abused people—she was terminated because she failed to adhere to Defendant's time and attendance policy and failed to satisfactorily perform the job duties of a YDA2.  Accordingly, Plaintiff has failed to put forth any admissible evidence—or any allegation—from which a reasonable factfinder could infer that a white male (or any other similarly situated employee outside her protected groups) with unsatisfactory job performance was treated differently than Plaintiff.

Moreover, while Plaintiff has alleged inappropriate and repugnant workplace behaviors by certain Finger Lakes employees, including offensive statements regarding race, these statements are insufficient to establish a *prima facie* case that she was terminated from her position because

she is African American and/or a woman.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72,

87 (2d Cir. 2015) (stating that a plaintiff can prove discrimination indirectly by creating a "mosaic

of intentional discrimination" by identifying "bits and pieces" of evidence that together give rise

to an "inference of discrimination.") (internal citation omitted).  "Verbal [statements] constitute

evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between

the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff."

*Pronin v. Raffi Custom Photo Lab., Inc.,* 383 F. Supp. 2d 628, 636 (S.D.N.Y. 2005) (citation

omitted).  "When evaluating the probative value of [statements] in discrimination cases, courts

evaluate the following factors:

> (1) who made the remark (*i.e.*, a decision[]maker, a supervisor, or a low-level co-
> worker); (2) when the remark was made in relation to the employment decision at
> issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the
> remark as discriminatory); and (4) the context in which the remark was made (*i.e.*,
> whether it was related to the decision-making process).

*Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 337 (S.D.N.Y. 2020) (quoting

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).  "The more removed [statements]

are from an employer's adverse action, the more likely that such statements will be non-probative

'stray remarks.'"  *Id*. (quoting *Henry*, 616 F.3d at 149); *see Shukla v. Deloitte Consulting LLP*,

No. 1:19-cv-10578 (AJN) (SDA), 2020 WL 3181785, at \*9 (S.D.N.Y. June 15, 2020) ("Even

statements that are clearly racist, ageist, and religiously inappropriate are not discriminatory when

they are stray remarks not connected to the adverse employment decision.").  The facially

discriminatory statements alleged by Plaintiff were made by low-level co-workers, who, based on

the evidence in the record, did not have anything to do with Plaintiff's termination.  As such, the

statements made by Plaintiff's co-workers, as offensive and inappropriate as they might be, are

stray remarks and cannot be imputed to Defendant.  *See Di Giovanna v. Beth Israel Med. Ctr.*, 651

F. Supp. 2d 193, 202-03 (S.D.N.Y. 2009) (co-worker's statement could not be imputed to employer where there was no evidence that she "had anything to do with" the employment decision affecting plaintiff).

In addition to the facially discriminatory statements made by Plaintiff's co-workers, Plaintiff alleges that two supervisors, Bowen and an unnamed supervisor, made statements that she perceived to be discriminatory or threatening. Specifically, Plaintiff alleges that Bowen stated that "I'm the one that brought you in, I can take you out," Dkt. No. 42-4 at 2:3-3:3; Dkt. No. 47 at 11, which Plaintiff perceived to be a "threat," No. 42-4 at 5:6-19. Plaintiff also alleges that in or around October 2019, Bowen purportedly posted a graphic on her Facebook page containing the words "snitches get stitches," which Plaintiff believes was in reference to her lodging complaints against Finger Lakes employees. *See* Dkt. No. 1 at ¶¶ 40-42. Plaintiff does not assert that Bowen's statements were made in the context of her termination. Additionally, Plaintiff alleges that an unnamed supervisor at an unknown time referred to her as the "thick new girl." Dkt. No. 42-2 at 65:3-8; Dkt. No. 47 at 7.

"Courts in this [C]ircuit have dismissed claims alleging statements that are more facially discriminatory than the ones alleged here—including remarks made by decisionmakers—for failure to [establish] a . . . nexus between the statements and the adverse employment decision." *Desrosiers v. Summit Sec. Servs., Inc.*, No. 21-CV-10941 (JPO), 2022 WL 13808524, at *5 (S.D.N.Y. Oct. 21, 2022) (citing *Martin v. City Univ. of New York*, No. 17 Civ. 6791 (KPF), 2018 WL 6510805, at *9 (S.D.N.Y. Dec. 11, 2018) (dismissing race discrimination claim for lack of casual connection where a decisionmaker made stray remark that "those Irish guys are always up to something"); *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) (dismissing gender and age discrimination claims for lack of nexus with decision-making

process where supervisor stated multiple times that he was tired of working with "menopausal women")).

Here, Plaintiff does not sufficiently allege a nexus between either of Bowen's statements and her termination.  Plaintiff alleges that Bowen made the threatening comment approximately 7 months prior to Plaintiff's termination and posted the Facebook graphic approximately 6 months prior to Plaintiff's termination.  *See* Dkt. No. 1 at ¶ 40; Dkt. No. 47 at 11.  The time lapse between these statements and Plaintiff's termination suggests that the incidents were not related.  *See Henry*, 616 F.3d at 149 ("The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." (citation omitted)); *see also Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 743 (2d Cir. 2014) (summary order) (context and timing of comment—6 months before first adverse employment action was taken—made it "too remote and oblique to raise a triable issue"); *Mesias*, 106 F. Supp. 3d at 438 (finding no nexus between remarks and plaintiff's termination where the "first comment was made a year and a half before Plaintiff was fired, and the second was made more than three months before Plaintiff's termination.").

As for the "thick new girl" statement, Plaintiff has alleged no facts establishing when—or the context in which—the statement was made.  Plaintiff's inability to situate this statement in time and context weighs against a finding that this statement is probative of discriminatory intent.  *See Smith*, 440 F. Supp. 3d at 338; *Huminski v. Stop & Shop Supermarket Co.*, No. 3:16-cv-1136 (RNC), 2019 WL 4804913, at *4 (D. Conn. Sept. 30, 2019) (fact that "record is silent as to the timing of the . . . remark" was "factor[ ] weigh[ing] against plaintiff").  Because the evidence in the record fails to establish a nexus between the statements made by Bowen and the unnamed supervisor and Plaintiff's termination, the Court finds that these statements are stray remarks and

thus do not give rise to an inference of discrimination.[15]  *See, e.g., Fletcher*, 775 F. App'x at 13 (affirming grant of summary judgment to defendants as to plaintiff's discrimination claim despite plaintiff's sworn statement that her direct supervisor and two other supervisors called her "bitch" and "black bitch," and referred to her as "bubble girl," noting that such remarks were stray remarks).

Accordingly, based on the record before the Court, the Court finds that a reasonable factfinder could not conclude that Plaintiff's termination occurred in circumstances giving rise to an inference of discrimination based on Plaintiff's gender or race.

### B.  Plaintiff's Retaliation Claims

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e–3(a)).

---

[15] To the extent Plaintiff posits that the statements made by Plaintiff's co-workers and supervisors can be imputed to Defendant because Defendant was negligent in controlling work conditions, Plaintiff's argument is unavailing.  *See Matsko v. New York*, 5:18-CV-857 (MAD/TWD), 2022 WL 137724, at *7, 11 (N.D.N.Y. Jan. 14, 2022).  "To demonstrate that an employer is negligent in controlling working conditions, a plaintiff must adduce evidence that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Id.* at *6 (quoting *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 92 (2d Cir. 2019)) (internal quotation marks omitted); *see also Lekettey v. City of New York*, 637 F. App'x 659, 662 (2d Cir. 2016) (summary order) (finding that the plaintiff alleged "no facts from which it can be plausibly inferred that defendants were negligent or unresponsive to her complaints about the workplace").  Here, first, there is no evidence to suggest that Defendant failed to provide a system for registering complaints. Second, there is no evidence to suggest that Defendant failed to respond to Plaintiff's complaints. Although Plaintiff alleges that her complaints were not taken "seriously," the evidence demonstrates that Defendant followed its established procedures for handling complaints with respect to Plaintiff's complaints.

Retaliation claims under Title VII, like discrimination claims, are analyzed according to the *McDonnell Douglas* burden-shifting framework. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'" *Summa*, 708 F.3d at 125 (quoting *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 608 (2d Cir. 2006)).

"'Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.'" *Id.* (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)). "If the employer demonstrates a legitimate, non-discriminatory reason, then '[t]he burden shifts . . . back to the plaintiff to establish through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'" *Id.*

"The term protected activity refers to action taken to protest or oppose statutorily prohibited discrimination." *Comerford v. N. Syracuse*, No. 5:18-cv-01143 (BKS/TWD), 2021 WL 950974, at *28 (N.D.N.Y. Mar. 12, 2021) (internal quotation marks and citation omitted). "[O]pposition includes activities such as making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Id.* (internal quotation marks and citations omitted). "[I]mplicit in the requirement that the employer [was] aware of the protected activity is the requirement that the [employer] understood, or could have reasonably understood, that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by Title VII. *Id.* (alterations in original, internal quotation marks and citations omitted).

Here, Defendant does not argue that Plaintiff cannot satisfy the elements to establish a *prima facie* case of retaliation based on gender and race. *See* Dkt. No. 42-9 at 19-20. Instead, Defendant argues that Plaintiff cannot make out her retaliation claims because Plaintiff cannot demonstrate that Defendant's proffered reason for terminating Plaintiff was pretextual, and that but-for her protected activity (*i.e.*, lodging complaints of discrimination and harassment), she would not have been terminated. *Id.* at 23-25. Defendant has presented ample evidence of a legitimate, non-retaliatory reason for Plaintiff's termination—*i.e.*, Plaintiff's unsatisfactory job performance. *See, e.g., Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 14 (2d Cir. 2018) (summary order) (affirming district court's dismissal of Title VII claim where the plaintiff was terminated because she, among other things, violated the employer's attendance policy when she was absent 44 times and late 85 times between February 2009 and January 2010); *Matsko*, 2022 WL 137724, at *11 (finding unsatisfactory time and attendance, among other things, constitutes a legitimate, non-retaliatory reason for termination).

### 1. Pretext

"Under the *McDonnell Douglas* framework, if the defendant provides a non-retaliatory reason for the [adverse action], that reason overcomes the presumption of retaliation created by the plaintiff's *prima facie* case." *Rumsey v. Ne. Health, Inc.*, 89 F. Supp. 3d 316, 337 (N.D.N.Y. 2015). The Supreme Court in *Univ. of Tex. Sw. Med. Ctr. v. Nassar* held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S. 338, 360 (2013). "[B]ut-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan v. Andalex Grp.*

*LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (internal quotation marks omitted).  Therefore, "a plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* (citations omitted).

Here, while Plaintiff posits explanations for her unsatisfactory job performance, she has failed to show "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's articulated basis for her termination.  *See id.*  Although not entirely clear, Plaintiff appears to argue that temporal proximity coupled with three statements purportedly made by non-supervisory employees creates an issue of material fact with respect to pretext.  Dkt. No. 47 at 21.  However, Plaintiff has not alleged that any supervisor, or anyone involved in the decision to terminate her, made any statement, or took any action demonstrating that she was retaliated against for lodging complaints of discrimination and harassment.  For the same reasons discussed in Section IV.A.i.2 *supra*, these three statements are stray remarks and cannot be imputed to Defendant.  Therefore, Plaintiff cannot point to anything beyond temporal proximity that could create an issue of fact.[16] Because "temporal proximity alone is insufficient to defeat summary judgment," Plaintiff's retaliation claims fail.  *Matsko,* 2022 WL 137724, at *11 (citations omitted).

In sum, the Court cannot conclude that a reasonable factfinder could infer that retaliation was a but-for cause of Plaintiff's termination because the record is replete with unrefuted evidence of Plaintiff's unsatisfactory job performance.[17]  *See, e.g., Goonewardena v. New York Workers*

---

[16] Because Defendant does not dispute temporal proximity, the Court will assume for purposes of resolving the Motion that Plaintiff has established temporal proximity.

[17] The Court notes that courts in this Circuit have held that the "determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to

*Comp. Bd.*, 258 F. Supp. 3d 326, 345-46 (S.D.N.Y. 2017) (finding that termination was not pretext for retaliation where plaintiff's performance issues were well documented).   Accordingly, Defendant's motion for summary judgment as to Plaintiff's retaliation claims is granted.

## V.   CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, Dkt. No. 42, is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's Complaint, Dkt. No. 1, is **DISMISSED** with prejudice; and the Court further

**ORDERS** that the Clerk shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 27, 2023
       Albany, New York

*Anne M. Nardacci*
Anne M. Nardacci
U.S. District Judge

---

disposition by summary judgment, because it requires weighing of the disputed facts." *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 320 (E.D.N.Y. 2014) (quoting *Kwan*, 737 F.3d at 846 n.5).  Here, however, it is undisputed that Plaintiff's job performance was unsatisfactory. *See, e.g.*, Dkt. No. 46 at ¶¶ 57, 78-80.